# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | **PLAINTIFF** |
| | § | |
| **v.** | § | **CAUSE NO. 1:09cv376-LG-RHW** |
| | § | |
| **INDIGO INVESTMENTS, LLC,** | § | |
| **EDWARD L. HAMILTON, and** | § | |
| **BARBARA A. HAMILTON** | § | **DEFENDANTS** |

## MEMORANDUM OPINION AND ORDER DENYING
## SUMMARY JUDGMENT AND MOTION TO STRIKE

BEFORE THE COURT are Defendants Indigo Investments, LLC, Edward L. Hamilton, and Barbara A. Hamilton's Motion for Summary Judgment [89] and Plaintiff United States of America's Motion to Strike New Evidence [100]. The Government initiated this enforcement action under the Fair Housing Act. Defendants argue (1) there is no prima facie evidence of discrimination, (2) they were uniformly enforcing park rules, and (3) there is no evidence of pretext. The Government argues Defendants submitted new evidence for the first time on rebuttal. The Court has considered the parties' submissions and the relevant legal authority. The motions are denied.

## FACTS AND PROCEDURAL HISTORY

Indigo owned a mobile home park in Gulfport, Mississippi, known as Homestead Mobile Home Village. Mr. and Mrs. Hamilton were its property managers and resided on site.

After Hurricane Katrina, the Federal Emergency Management Agency leased lots from Homestead. FEMA trailers were placed on these lots. People who the

hurricane had displaced from their homes leased the FEMA trailers.  As part of their lease, they agreed to abide by Homestead's rules for Homestead's tenants.  One of the rules provided that eviction could result after three written warnings of rules violations.

Two of these FEMA-placed tenants were Maggie[1] and Jermille Johnson, an African American couple.  On March 8, 2006, the Hamiltons simultaneously served three written warnings for alleged rules violations and an eviction notice.  Eviction proceedings were commenced in State court but were dismissed because the court questioned its jurisdiction to evict FEMA tenants.  Eventually, the Johnsons moved away, claiming they were constructively evicted on account of their race.

The Johnsons complained to the Department of Housing and Urban Development and to the Gulf Coast Fair Housing Center.  It sent a Caucasian woman and an African American man to test Defendants by posing as potential renters or buyers. The Government also investigated and determined there was reasonable cause to believe the Johnsons were discriminated against on account of their race or color. One of the Defendants elected to have the case heard before a District Court.

As a result, the Government filed the instant enforcement action under the Fair Housing Act, claiming that the Johnsons, other African American tenants, and mixed race tenant households were discriminated against by Defendants on account of race or color.  Specifically, the United States claims that Defendants enforced the rules

---

[1]Her last name appears alternatively in the record as "Barnes."

more harshly against African Americans and mixed race families, falsely accused both of violating the rules, and enforced extraneous, unwritten rules against both. The Government also claims that some of these aggrieved persons were constructively evicted.

## DISCUSSION

<u>Motion for Summary Judgment</u>

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. The Court must view the evidence in the light most favorable to the non-moving party. *Abarca v. Metro. Transit. Auth.*, 404 F.3d 938, 940 (5th Cir. 2005). A "material fact" is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute about a material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

The party that bears the burden of proof at trial also bears the burden of proof at the summary judgment stage. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 325. Once

the movant carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted.  *Id.* at 324-25.  "[W]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon . . . mere allegations or denials . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

> Title VIII, the FHA, makes it:
>
> unlawful--
>
> (a) To . . . refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, . . . familial status. . . .
>
> (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, . . . familial status. . . .
> . . .
>
> (d) To represent to any person because of race, color, . . . familial status . . . that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

42 U.S.C. § 3604.  Additionally, the FHA makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section . . . 3604 . . . of this title."  42 U.S.C. § 3617.  The Act authorizes the Government to bring housing discrimination claims on behalf of individuals and groups.  42 U.S.C. §§ 3610(g)(2)(A), 3614(a).  If an individual files a claim of housing discrimination with the Secretary of Housing and Urban Development, and he "determines that reasonable cause exists to believe that a discriminatory housing practice has occurred . . . [he] shall . . . immediately issue a

charge on behalf of the aggrieved person." 42 U.S.C. § 3610(g)(2)(A). Additionally, if the Secretary has "reason to believe that a basis may exist for the commencement of proceedings . . . under" the pattern and practice enforcement provision of the Act, he shall refer the matter to "the Attorney General, or to such authorities, as the case may be." 42 U.S.C. § 3610(e)(2). This provision reads:

> Pattern or practice cases. Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title, or that any group of persons has been denied any of the rights granted by this title and such denial raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States district court.

42 U.S.C. § 3614(a).

In this case, the Government brings both types of claims. First, it asserts the Johnsons suffered intentional housing discrimination on account of their race or color. Secondly, the Government asserts Defendants engaged in a pattern or practice of intentional housing discrimination against African Americans and interracial households. Included in this pattern or practice is the alleged disparate treatment of the Johnsons.

The Fifth Circuit applies the analyses developed in Title VII case law to cases under the FHA. *Artisan/Am. Corp. v. City of Alvin*, 588 F.3d 291, 295 (5th Cir. 2009). To prove disparate treatment under this case law, a plaintiff must first present a *prima facie* case of discrimination. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977). He may do so through either direct or circumstantial evidence. *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005). If he does so with only circumstantial

evidence, the defendant must rebut the inference of discrimination. *Teamsters*, 431 U.S. at 358, 360. If the defendant does so, the burden is shifted back to the plaintiff to rebut the defendant's explanation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).

I.     PATTERN OR PRACTICE OF INTENTIONAL DISCRIMINATION

To prove its pattern or practice case, the Government must prove either (1) a pattern or practice of discrimination or (2) that a group of persons was denied their FHA rights and this raises an issue of general public importance. 42 U.S.C. § 3614(a).

A.     Prima facie case

Defendants first argue that the Government cannot prove a *prima facie* case under the *McDonnell Douglas* test as to each of the individual aggrieved persons. The Government responds that it is not required to do so and that there is a genuine issue of material fact as to whether a discriminatory pattern or practice existed.

In *Teamsters*, the Supreme Court rejected the notion that "the *McDonnell Douglas* pattern [i]s the only means of establishing a prima facie case of individual discrimination." *Teamsters*, 431 U.S. at 358. The Court held that in a pattern and practice case, the Government's "initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by" the defendant. *Id.* at 360. The Government "is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the . . . discriminatory policy. Its burden is to establish a prima facie case that such a policy existed." *Id.* This "supports an

inference that any particular . . . decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." *Id.* at 362.

Defendants have failed to carry their initial summary judgment burden on the prima facie case.

### B.   REBUTTAL OF PRIMA FACIE CASE

In the alternative, Defendants argue that there is a legitimate, nondiscriminatory explanation for its actions, which the Government cannot refute.

Once the prima facie case has been established, Defendants may rebut the discriminatory inference by "demonstrating that the Government's proof is either inaccurate or insignificant," or by providing "a nondiscriminatory explanation for the apparently discriminatory result" of the pattern or practice. *Id.* at 360. If providing a nondiscriminatory explanation, this is a burden of production only. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981). "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254.

Defendants assert that they were uniformly enforcing the park's rules. Thus, they have satisfied their burden of rebutting the prima facie case.

### C.   PRETEXT

The burden now shifts back to the Government to refute Defendants' explanation. *McDonnell Douglas*, 411 U.S. at 804. Particularly, the plaintiff must show (1) the reason is a pretext for unlawful discrimination, or (2) the "reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the

plaintiff's protected characteristic." *Burrell v. Dr. Pepper / Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411-12 (5th Cir. 2007).

The Government argues there is a genuine issue of fact as to whether this explanation is a pretext for unlawful discrimination because some of the alleged violations were not in the actual rules, the rules were not uniformly enforced, and the Hamiltons used racial slurs and harassment when enforcing the rules.

First, there is evidence that some of the claimed rules that Defendants enforced against African-American and interracial family tenants were not actually part of the park's rules.  For example, park rule number three was, "ALL CHILDREN MUST STAY IN THEIR OWN YARDS AFTER 9pm.UNLESS [sic] WITH A [sic] ADULT." (Defs.' Mot. Summ. J. Ex. 3 at 1).  Rule number ten stated, "NO CHILDREN MAY BE OUTSIDE OF THEIR YARDS WITHOUT ADULT SUPERVISION AFTER 9pm.SUNDAY [sic] [through] THURSDAY.AND [sic] 11 pm. [sic] FRIDAY AND SATURDAY."  *Id.* at 2.  However, there is evidence that Mrs. Hamilton told tenant Linda Reyes[2], the mother of an interracial family[3], that her:

> children could not play outside of their yard and that they . . . needed to be inside after dark.  During this conversation Ms. Hamilton told Mr. [William] Batey [Reyes's African-American boyfriend] that Homestead was better before 'you people' came here. . . .  While at Homestead, Ms. Reyes and Mr. Batey both saw white children playing outside of their yards, before and after dark.

(Pl.'s 3d Am. Resp. to Interrogs. at 3).  According to her son Diem Duong, "Barbara

---

[2]Her surname appears alternatively in the record as "Duong."

[3]Reyes is Caucasian, and the father of her children is Asian.

8

Hamilton also told me several times that I needed to go inside after dark. I saw white children playing outside after dark." (Duong Aff. at 1 (¶6)). There is evidence that Mr. Hamilton told African American tenant Mitchell Jefferson "that his children should not play in the area at the front of Homestead after dark. Mr. Jefferson frequently saw white children playing in the area at the front of Homestead after dark." (Pl.'s 3d Am. Resp. to Interrogs. at 15). His son Nicholas Cooper testified, "On multiple occasions, Edward Hamilton or Barbara Hamilton told me that I could not play outside after dark. Barbara Hamilton told me she could fine me or evict my parents if I did so. I saw white children playing after dark." (Cooper Aff. at 1 (¶5)). Likewise, there is evidence that one of the Hamiltons told Rose Robinson, an African American tenant who resided with her minor granddaughters, "that children had to be inside after dark and children had to be supervised whenever they were outside. . . . While at Homestead, Ms. Robinson saw white children playing outside, unsupervised, before and after dark. Ms. Robinson did not see black children playing outside at Homestead." (Pl.'s 3d Am. Resp. to Interrogs. at 18). Likewise, there is evidence that Mrs. Hamilton scolded African American tenant Victoria Tucker for "not attending to her children, who were playing outside in Ms. Tucker's front yard. Ms. Hamilton went on to say that the children 'did not need to be outside in case something gets broke.'" *Id.* at 19. Thus there is evidence that Hamiltons' restrictions on when, where, and if African American or biracial children could play outside was not justified by Homestead's rules. All the rules stated was that children had to be accompanied by an adult, if outside their yard, after certain times. There was no written requirement

that children stay in their own yards, stay inside, stay away from the green area, or be accompanied by an adult before 9:00 p.m.

Another complaint of an extraneous rule concerns satellite dishes. The Homestead rules do not mention satellite dishes. Mrs. Hamilton testified that if the trailer itself was rented from Homestead, the tenant had to get approval from Chris Hebert, Homestead's owner, before the tenant could attach a satellite to the trailer. Further:

> Q.    Okay. You did not talk to [FEMA tenants] about satellite dishes that were attached to the trailer, is that what you said?
>
> A.    Yeah. I had nothing to do with their trailer.

(Mrs. Hamilton Dep., Vol. II, at 368). Nevertheless, Robinson (who resided in a FEMA trailer) stated that she received a written notice telling her that she had to remove her satellite dish and Mr. Hamilton had also told her this. She was told that she "needed to remove her satellite dish or she would be evicted." (Pl.'s 3d Am. Resp. to Interrogs. at 18).

Other evidence of a non-existent rule concerned the type of music that a tenant could play. Regarding music, the rules stated "NO LOUD MUSIC COMING FROM THE FOLLOWING HOMES,CARS, [sic] TRUCKS ,YOUR [sic] COMPANIES [sic] VEHICLES." (Defs.' Mot. Summ. J. Ex. 3 at 1). There was no restriction on the type of music that could be played. There is evidence, however, that Mrs. Hamilton told Batey that he could only have a barbecue:

> as long as he did not play "bee bop" music [and]. . . . On one occasion, when Mr. Batey was sitting in his car outside of Ms. Reyes' trailer

listening to rhythm and blues music, Barbara Hamilton came by and told him . . . "bee bop" music was not allowed, that Homestead was a nice park before "you people" moved in, and that it was going to stay that way.

(Pl.'s 3d Am. Resp. to Interrogs. at 3-4).

Although the Homestead rules do not mention storage pods, "Edward Hamilton told [Mr. Jefferson] that [he] could not keep a storage pod by the trailer." (Mr. Jefferson Aff. at 1 (¶5)).

Further, the Homestead Rules provide:

THERE ARE THREE [3] DUMPSTERS AT THE FRONT OF THE PARK FOR THE TENANTS [sic] USE,HOWEVER [sic] THESE ARE FOR HOUSEHOLD GARBAGE ONLY,NO [sic] FURNITURE [sic] ,BIKES [sic] ,OR [sic] TIRES,ETC. [sic] IS TO BE PLACED OUTSIDE THE DUMPSTERS, [sic] [3] WRITTEN WARNINGS FOR THIS COULD RESULT IN AN EVICTION.

(Defs.' Mot. Summ. J. Ex. 3 at 1). While, all three of these dumpsters are for tenants, Mrs. Johnson averred, "Shortly after we moved into Homestead, Barbara Hamilton came to our trailer and said that one of my sons put trash in the wrong dumpster. She said that she could evict us for putting trash in the wrong dumpster." (Mrs. Johnson Aff. at 1 (¶5)).

Additionally, the written park rules do not regulate parking. Nevertheless, African American tenants Paula and Kenyatta Gale claim that Mrs. Hamilton told them that Kenyatta's car could not be parked next to Paula's, and Mrs. Hamilton could evict them if they did not move the car. "During this conversation Ms. Hamilton told Paula Gale that they needed to move the vehicle because the 'white woman' who lived next door to them had a new car, and Ms. Hamilton did not want it to get damaged by

11

work her employees were doing." (Pl.'s 3d Am. Resp. to Interrogs. at 12). Likewise, Mitchell and, his African-American wife, Beverly Jefferson claim that the Hamiltons accused them and their African-American guests of parking improperly. "At these times, Ms. Hamilton referred to the Jeffersons and their guests as 'you people.'" *Id.* at 15-16.

The written rules also do not prohibit fireworks. There is evidence that "On July 4, 2006, Edward Hamilton told Mr. Jefferson that his children were not allowed to set off fireworks at Homestead." *Id.* at 15.

Other evidence which a jury could conclude calls the nondiscriminatory explanation into question is evidence that African American and interracial family tenants were falsely accused of conduct which they did not commit. By way of example, although the Hamiltons accused Batey, Reyes, African American tenant Charfonya Boose, Mr. and Mrs. Jefferson and their African American guests, Victoria, her fiancé Roosevelt Cherry, her niece Yvette Tucker, Mrs. Johnson and her African American guests Tomica Samuel and Tanishka Young of speeding, they deny driving over the park's speed limit. Although the Hamiltons accused Batey, Charfonya, and Victoria of playing loud music, they deny that they ever played loud music. According to the Jeffersons, the Hamiltons:

> accused the Jefferson family of knocking over a mailbox at Homestead and demanded that they pay for its replacement. While no one in the Jefferson family knocked over a mailbox at Homestead, they paid the replacement cost that the Hamilton Defendants demanded in order to avoid additional conflict with the Hamilton Defendants.

*Id.* at 16.

There is also evidence that the Hamiltons did not in fact uniformly enforce the written notice and eviction rule.  According to Defendants, the rules allowed an eviction notice to be issued after three written warnings.  However, Charfonya only received two written warnings before her eviction notice.  Her third written warning was not issued until three days after her eviction notice.  Notably this was one month after Defendants received notice of the discrimination complaint filed by the Johnsons. According to Mrs. Johnson, she received three written warnings simultaneously with her eviction notice.  Viewed in the light most favorable to the Government, all three written warnings appear to be about the same exact incident.  They are all for speeding and disturbing the peace on March 4, 2006.  The first states "speeding [on] 3/4/06 . . . Speeder was asked to do speed limit the women driving shot a bird and said F _ _ _ _ [sic] you." (Pl.'s Resp. Ex. M at 2).   The second reads, "speeding, loud music, threatening park employees with violence [on] 3/4/06 . . . note: police had to be called for #87 company to settle down."  *Id.* at 3.   Finally, the third reads, "speeding, Disturbing the peace [on] 3/4/06 . . . again, police had to be called, Due to fact the company to #87 kept speeding thru park and cussing, using vulgar Language on Lady [sic] even threatened she had a gun."  *Id.* at 4.  Reyes received three written warnings followed by a thirty-day eviction notice.  On the other hand, Caucasian tenant Travis Vick averred that he received four written warnings plus a "written reminder" about the rules affecting his pet, but he never received a thirty-day eviction notice.  (Vick Aff. at 1 (¶3)).  There is evidence that Caucasian tenant Kris Perry received six written warnings before a thirty-day eviction notice on March 8, 2006, followed by a three-day

13

eviction notice on May 23.  There is evidence that Caucasian tenant Ira Locke, Jr., received three written warnings concerning his pet.  On the third warning a note is written that because he subsequently removed the animal from the property, the "notice was pulled back.  And removed from notice list if no other problems in 30 days." (Pl.'s Resp. Ex. I at 8).  There is evidence that Caucasian tenant Starla Reid received three written warnings and no eviction notice.  There is evidence that Caucasian tenant Margo Kiel received three written warnings and no eviction notice.

Finally, there is evidence that the Hamiltons used racial epithets and harassment towards African American and interracial family tenants and guests. Robinson averred that on "at least two occasions, I heard Edward Hamilton use the word 'nigger' when talking to other African-American tenants in the park."  (Robinson Aff. at 1 (¶)).  Additionally, Melissa Byrd Harrison gave evidence of racial animus.  She is Caucasian, married to Demond Harrison, an African American, and the two of them shared three children.  She signed a lease with Homestead on November 21, 2005. According to her:

4.      Approximately a week after signing a lease for a Homestead trailer, I went to talk to Barbara Hamilton because I discovered some of my belongings, which had been in my trailer, were missing.

5.      Initially, Barbara Hamilton was sympathetic, apologizing for what had happened.  When my husband joined us and told Ms. Hamilton that he was with me, her demeanor changed.  Ms. Hamilton asked, "Why did you people leave your things there?" Because Ms. Hamilton's demeanor and attitude changed as soon as my husband joined us, I understood that "you people" was a reference to his race and our interracial relationship.

14

6.    Later, I was talking with my husband and another interracial couple and Ms. Hamilton walked by and said, "There goes the neighborhood.  The niggers are moving in."

(Mrs. Harrison Aff. at 1).  According to the Government, this final statement was made only a "short time later" that same day.  (Pl.'s 3d Am. Resp. to Interrogs. at 14).  Cooper accuses Mr. Hamilton of telling him "You people always think you can do what you want."  (Cooper Aff. at 1 (¶7)).  Other "you people" comments have already been discussed previously.  According to Mrs. Jefferson she drove past Mrs. Hamilton one day and saw her talking to another woman.  "Ms. Hamilton said, 'Look at that black bitch speeding.'"  (Mrs. Jefferson Aff. at 1 (¶7)).  Other evidence concerns Brandon Boose, Charfonya's brother who resided with her, his Caucasian girlfriend, and their biracial baby.  According to Brandon, "Edward Hamilton told me several times that I could not stay there.  Mr. Hamilton told me that they did not allow interracial couples at Homestead."  (Brandon Aff. at 1 (¶5)).  There is evidence that he also "called him a 'nigger,' and told him he had to leave" during this conversation.  (Pl.'s 3d Am. Resp. to Interrogs. at 6).  According to the Government, Mr. Hamilton continued to approach Brandon, thereafter, telling him he had to leave.  "The last time that Mr. Hamilton approached Mr. Boose, [Mr. Hamilton] called [Brandon] a 'nigger boy.'" *Id*.  Charfonya testified that Mr. Hamilton likewise used racial harassment when discussing her tenancy.  When one of her guests, "had accidentally caused minor damage to Homestead property, I offered to fix it.  He said to me, 'I am a redneck from Alabama.  If someone messes up out here I'll buy some chains and there's a pond back there and they will be found missing.'"  (Charfonya Aff. at 1 (¶5)).  Finally, the Johnsons and their

15

guests testified to this same type of conduct.  Samuel testified that when she arrived to attend the Johnsons' barbecue, the Hamiltons cursed at her and accused her of speeding.  Because she received a phone call from her daughter, she had to turn around to leave, but a car had appeared and blocked her exit.  She maneuvered around and left.  When she returned with her daughter, "Barbara Hamilton called me a 'nigger' and made profane gestures at me, and Edward Hamilton cursed at me."  (Samuel Aff. at 1 (¶4)).  Subsequently, after the State court dismissed the eviction action filed against the Johnsons, Mrs. Johnson claims that she "was driving through Homestead and Edward Hamilton drove straight towards my car, nearly hitting it.  He did not stop until he was a few feet away from my car."  (Mrs. Johnson Aff. at 2 (¶10)).  Viewed in the light most favorable to the Government, the majority of these statements and actions were made during or close in time to discussions about the terms of the respective tenancies–whether or not someone had a valid complaint, whether or not someone had broken park rules, or whether or not someone was welcome to reside in the park.  There is evidence that the Hamiltons were the managers and were responsible for enforcing the park's rules and eviction policy.

The Court need not decide whether there is further evidence of pretext.  Viewing the above evidence in the light most favorable to the nonmovant, a reasonable jury could conclude that Defendants' proffered explanation is merely a pretext and that race or color was a motivating factor for their conduct.

## II.   INDIVIDUAL DISCRIMINATION AGAINST THE JOHNSONS

Because there is evidence that there was a pattern and practice of housing

discrimination against African Americans during the same time period as the Johnsons' complaints, there is no need for the Court to examine whether there is evidence to support the individual claims brought on the Johnsons' behalf.

MOTION TO STRIKE

The Government asks the Court to strike certain of the Defendants' evidence as new evidence presented for the first time on rebuttal. All the challenged evidence does is ask the Court to discredit the Government's witnesses, claiming that they are untrustworthy and the Hamiltons are more reliable. Credibility is for the jury, not for the Court on summary judgment. This evidence underscores the fact that there is a jury question on whether or not a discriminatory pattern and practice existed. Because there is no prejudice to the Government, the Court need not consider whether the evidence should be stricken. Therefore, the motion to strike is moot.

**IT IS THEREFORE ORDERED AND ADJUDGED** that for the reasons stated above Defendants Indigo Investments, LLC, Edward L. Hamilton, and Barbara A. Hamilton's Motion for Summary Judgment [89] should be and is hereby **DENIED.**

**IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiff United States of America's Motion to Strike New Evidence [100] should be and is hereby **DENIED AS MOOT.**

**SO ORDERED AND ADJUDGED** this the 15th day of November, 2010.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE

17